# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 22-1118V
### Filed: November 22, 2024

|  |  |
|---|---|
| MELANIE BOSTIC, on behalf of her minor child, K.T., <br><br> Petitioner, <br><br> v. <br><br> SECRETARY OF HEALTH AND HUMAN SERVICES, <br><br> Respondent. | Special Master Horner |

*Melanie, Bostic, pro se, Orange Park, FL, petitioner.*
*Debra A. Filteau Begley, U.S. Department of Justice, Washington, DC, for respondent.*

### DECISION DISMISSING PETITION[1]

On August 26, 2022, petitioner filed a petition under the National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa-10, *et seq.* (2012),[2] alleging that her minor child, K.T., suffered "debilitating arm, shoulder, thoracic, and neurological injuries suffered as a direct result of his vaccination with HPV-Gardasil 9." (ECF No. 1, p. 1.) The vaccination at issue was administered on August 26, 2019, and the petition alleged onset of an adverse reaction beginning the same day. (*Id.* at 1-2.) For the reasons discussed below, this case is now DISMISSED.

---

[1] Because this document contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the document will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] Within this decision, all citations to § 300aa will be the relevant sections of the Vaccine Act at 42 U.S.C. § 300aa-10, *et seq.*

I.    **Procedural History**

Petitioner filed this action on behalf of her minor child, K.T., on August 26, 2022. (ECF No. 1.)  At that time, she was acting *pro se*.  On September 27, 2022, counsel for petitioner, Mr. Andrew Downing, entered the case via a consented motion to be substituted as counsel.  (ECF No. 11.)  Petitioner's counsel subsequently filed medical records on November 16, 2022, February 13, 2023, and April 24, 2023, marked as Exhibits 1-8.  (ECF Nos. 13, 17, 22.)

However, on May 4, 2023, petitioner initiated ex parte communication with the undersigned's chambers expressing displeasure with how her counsel intended to proceed.  (ECF No. 25.)  Petitioner's counsel filed a motion to withdraw as counsel and a follow up status conference was held.  (*Id.*; ECF No. 23.)  Petitioner was provided time to seek alternative counsel but was also advised of her obligations as a pro se petitioner to respond to court orders, meet deadlines, and ultimately prove her case.  (ECF No. 25.)

Petitioner's counsel's motion to withdraw was subsequently granted (ECF No. 37) and a separate decision was issued awarding attorneys' fees and costs to departing counsel (ECF No. 32).  The decision awarding attorneys' fees and costs indicated that the records filed to date were sufficient to establish the lower evidentiary burden for demonstrating that there was a reasonable basis for the filing of the petition, "albeit just barely."  (*Id*. at 8.)  However, petitioner was advised that "the fact that I have awarded attorneys' fees and costs should not be interpreted by petitioner as any indication that she will succeed in pressing her claim" and that "too much information remains unavailable at this juncture to assess the overall merits of the case."  (*Id*.)

On July 21, 2023, I issued a detailed order regarding petitioner's obligations as a *pro se* petitioner and how the case would proceed.  (ECF No. 38.)  I continued to encourage petitioner to seek alternative counsel but advised that the case would move forward regardless.  (*Id*. at 3.)  I advised petitioner that complete medical records had not yet been filed and urged her to begin collecting any records she knew to be outstanding.  (*Id*. at 2-3.)  Additionally, respondent was directed to identify a specific list of outstanding medical records he determined to be necessary to his medical review of the case.  (*Id*.)  On August 22, 2023, respondent filed a status report indicating that "numerous" medical records were missing that are "essential" to his review of the case and identifying the following specific records as outstanding:

- Medical records documenting K.T.'s care for the three years prior to the vaccination at issue; and

- Records pertaining to treatment of K.T.'s alleged vaccine-related injury, including records related to:

    o   Prior reportedly normal left arm x-rays as identified on April 23, 2020 (as referenced at Ex. 5, p. 59[3]);

    o   A neurology encounter referenced at petitioner's August 16, 2022, primary care appointment (as referenced at Ex. 5, pp. 11);

    o   Records from treatment at Nemours Orthopedics and Neurology (as referenced at Ex. 7, pp. 61-67);

    o   Records of a left shoulder MRI as ordered by the treating physicians (referenced at Ex. 7, pp. 63, 67);

    o   Records from orthopedic surgeon Marielle Amoli, M.D., to whom K.T. was referred[4];

    o   Records of treatment for K.T. at HCA Florida Memorial Hospital (as referenced in former counsel's billing records at ECF No. 30-1, p. 8).

(ECF No. 42.)

On August 31, 2023, I issued a follow up scheduling order. (ECF No. 45.) I advised that I was aware from an informal communication by petitioner that she had suffered a recent medical emergency and that she was still attempting to locate alternative counsel. (*Id*.) Accordingly, I allowed her a further 45-days to seek counsel. (*Id*.) Petitioner was ordered to file a status report confirming whether she had retained new counsel by October 16, 2023. (*Id*.) Petitioner did not respond to this order and a follow up order was issued giving petitioner until December 15, 2023, to file the required status report. (ECF No. 47.)

After petitioner failed to respond a second time, another follow up order was issued explaining that petitioner had been permitted a full and fair opportunity to seek counsel and that she must now file the outstanding medical records herself. (ECF No. 48.) Petitioner was provided a period of 60-days to file the outstanding records and also advised as to the procedure for requesting additional time pursuant to Vaccine Rule 19(b). (*Id*.) Petitioner was cautioned that "given petitioner's lack of consistent contact with the court, failure to respond to this order will result in an order to show cause why this case should not be dismissed for failure to prosecute." (*Id*.)

Petitioner again failed to respond to the order directing her to file medical records. Accordingly, on March 25, 2024, an order to show cause was issued. (ECF

---

[3] Based on respondent's description, the correct citation is actually page 60.

[4] The specific citations respondent provided to evidence this referral (Ex. 7, pp. 29, 34) appear to be incorrect; however, the referral to Dr. Amoli is separately confirmed at Exhibit 7, pp. 11, 30.

No. 49.)  In response to the order to show cause, petitioner filed a letter to the court on May 6, 2024.  (ECF No. 52.)  In her letter, petitioner discussed some of the reasons she had struggled to comply with the prior orders.  (*Id*.)  With regard to the records requested by respondent, petitioner made two representations.  (*Id*.)  First, she discussed her unsuccessful efforts to have her son seen for further medical follow up.  (*Id*. at 1.)  Second, she indicated that "[a]ll I have at this point are the records that were already sent."  (*Id*.)

Because petitioner's letter suggested the possibility that petitioner had misunderstood the prior orders, a follow up order was issued, attaching respondent's specific records requests, and explaining that petitioner's obligation was to seek out and file already-existing medical records rather than any new evaluation of K.T.  (ECF No. 53.)  Petitioner was permitted a further 60 days, until July 22, 2024, to file the outstanding medical records and further advised that further time would be permitted "but only as long as she continues to maintain contact with the court and demonstrates she is making process in collecting the necessary records."  (*Id*. at 1-2.)

Petitioner allowed her July 22, 2024, filing deadline to lapse without having had any contact with the court.  Accordingly, a second order to show cause was issued instructing petitioner to show cause why the case should not be dismissed by no later than October 7, 2024.  (ECF No. 54.)  Petitioner again allowed her filling deadline to lapse without completing any filing or otherwise contacting the court.  Accordingly, on October 24, 2024, I issued an order advising that she had failed to respond to the order to show cause and that "petitioner is hereby put on notice that the undersigned will issue decision dismissing this case.  Absent action by petitioner, this decision will issue on Friday, November 22, 2024."  (ECF No. 55.)  As of this filing, petitioner has not communicated with the court in any capacity subsequent to her May 6, 2024, letter.  (ECF No. 52.)

## II.    Factual History

The medical records that have been filed to date confirm K.T. was vaccinated on August 26, 2019.  (Ex. 7, p. 5.)  At that time, he received both a Boostrix Tdap vaccination and a Gardasil 9 HPV vaccination.  (*Id*.)  The HPV vaccine was administered in his left arm and Tdap vaccine was administered in the right arm.  (*Id*.)  Respondent notes that no pre-vaccination records are available (ECF No. 42, p. 1); however, the vaccinations occurred at a routine well child visit at which the only noted concern was left eye astigmatism (Ex. 5, p. 82).  On September 19, 2019, petitioner called the doctor to report that she was concerned that K.T.'s left arm "still has pain" and that it hurts when moved.  (*Id*. at 67.)  Follow up care was sought on April 23, 2020.  (*Id*. at 56.)  K.T.'s primary care physician questioned (*i.e.,* noting "?") whether K.T. was experiencing nerve pain due to vaccine administration.  (*Id*.)  An x-ray of K.T.'s left humerus was performed, which was concerning for osteochondroma.  (*Id*. at 66.)  However, osteochondroma was not ultimately viewed as a likely explanation for K.T.'s symptoms.  (Ex. 7, p. 67.)

Following the x-ray, K.T. was referred to an orthopedist.  (Ex. 5, pp. 60-61.)
Thereafter, records suggest a breakdown in communication between petitioner and
K.T.'s primary care provider.  (*See, e.g., id.* at 54.)  The records filed to date suggest
this was followed by a gap in treatment from April 23, 2020, until August 16, 2022.
Thereafter, K.T. presented for care reporting a three-year history of post-vaccination
symptoms affecting the left arm.  (Ex. 7, p. 8.)  His treating physicians appeared to
remain unsure of the nature of K.T.'s underlying condition.  (*E.g., id.* at 12-13 (issuing
referrals to both neurology and orthopedics and stating that underlying cause of
symptoms is "unclear.")  K.T. was also referred to physical therapy and the
recommended modalities of treatment related to the deltoid, rotator cuff, and joint
capsule.  (Ex. 8, p. 10.)

## III.    Legal Standard

Under the National Vaccine Injury Compensation Program, compensation
awards are made to individuals who have suffered injuries after receiving vaccines.  In
general, to gain an award, a petitioner must make a number of factual demonstrations,
including showing that an individual received a vaccination covered by the statute;
received it in the United States; suffered a serious, long-standing injury; and has
received no previous award or settlement on account of the injury.  Finally – and the key
question in most cases under the Program – the petitioner must also establish a causal
link between the vaccination and the injury.  In some cases, the petitioner may simply
demonstrate the occurrence of what has been called a "Table Injury."  That is, it may be
shown that the vaccine recipient suffered an injury of the type enumerated in the
"Vaccine Injury Table," corresponding to the vaccination in question, within an
applicable time period following the vaccination, which is also specified in the Table.  If
so, the Table Injury is presumed to have been caused by the vaccination, and the
petitioner is automatically entitled to compensation, unless it is affirmatively shown that
the injury was caused by some factor other than the vaccination.  §§ 300aa–13(a)(1)(A)-
(B); § 300 aa–11(c)(1)(A)-(C); § 300aa–14(a).

As potentially relevant here, the Vaccine Injury Table lists a Shoulder Injury
Related to Vaccine Administration or "SIRVA" as a compensable injury if it occurs within
48 hours of vaccine administration.  *See* § 300aa–14(a), *amended by* 42 CFR § 100.3.
Table Injury cases are guided by statutory "Qualifications and aids in interpretation"
("QAIs"), which provide more detailed explanation of what should be considered when
determining whether a petitioner has actually suffered an injury listed on the Vaccine
Injury Table.  42 CFR § 100.3(c).  To be considered a "Table SIRVA," petitioner must
show that her injury fits within the following definition:

> SIRVA manifests as shoulder pain and limited range of motion occurring
> after the administration of a vaccine intended for intramuscular
> administration in the upper arm. These symptoms are thought to occur as a
> result of unintended injection of vaccine antigen or trauma from the needle
> into and around the underlying bursa of the shoulder resulting in an

inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis . . . . A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time-frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 CFR § 100.3(c)(10).

Otherwise, if no injury falling within the Table can be shown, the petitioner may still demonstrate entitlement to an award by showing that the vaccine recipient's injury was caused-in-fact by the vaccination in question. § 300aa–13(a)(1)(A); § 300aa–11(c)(1)(C)(ii). To so demonstrate, a petitioner must show that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly ex rel. Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1321-22 (Fed. Cir. 2010) (quoting *Shyface v. Sec'y of Health & Human Servs.*, 165 F.3d 1344, 1352–53 (Fed. Cir. 1999)); *see also Pafford ex rel. Pafford v. Sec'y of Health & Human Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006). In particular, a petitioner must show by preponderant evidence: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury in order to prove causation-in-fact. *Althen v. Sec'y of Health & Human Servs.,* 418 F.3d 1274, 1278 (Fed. Cir. 2005).

For both Table and Non-Table claims, Vaccine Program petitioners must establish their claim by a "preponderance of the evidence." § 300aa–13(a). That is, a petitioner must present evidence sufficient to show "that the existence of a fact is more probable than its nonexistence . . . ." *Moberly*, 592 F.3d at 1322 n.2. Proof of medical certainty is not required. *Bunting ex rel. Bunting v. Sec'y of Health & Human Servs.*, 931 F.2d 867, 873 (Fed. Cir. 1991). However, a petitioner may not receive a Vaccine Program award based solely on her assertions; rather, the petition must be supported

by either medical records or by the opinion of a competent physician.  § 300aa–
13(a)(1).  Once a petitioner has established their *prima facie* case, the burden then
shifts to respondent to prove, also by preponderant evidence, that the alleged injury was
caused by a factor unrelated to vaccination.  *Althen,* 418 F.3d at 1278 (citations
omitted); § 300aa–13(a)(1)(B).

Cases in the Vaccine Program are assigned to special masters who are
responsible for "conducting all proceedings, including taking such evidence as may be
appropriate, making the requisite findings of fact and conclusions of law, preparing a
decision, and determining the amount of compensation, if any, to be awarded."  Vaccine
Rule 3(b)(1).  Special masters must ensure each party has had a "full and fair
opportunity" to develop the record but are empowered to determine the format for taking
evidence based on the circumstances of each case, including having the discretion to
decide cases without an evidentiary hearing.  Vaccine Rule 3(b)(2); Vaccine Rule 8(a);
Vaccine Rule 8(d).  Special masters are not bound by common law or statutory rules of
evidence but must consider all relevant and reliable evidence in keeping with
fundamental fairness to both parties.  Vaccine Rule 8(b)(1).  Vaccine Rule 21(c)(1)
additionally provides that "[t]he special master or the court may dismiss a petition or any
claim therein for failure of the petitioner to prosecute or comply with these rules or any
order of the special master or the court."

In determining entitlement to compensation, the special master is required to
consider "all [] relevant medical and scientific evidence contained in the record,"
including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report
which is contained in the record regarding the nature, causation, and aggravation of the
petitioner's illness, disability, injury, condition, or death," as well as the "results of any
diagnostic or evaluative test which are contained in the record and the summaries and
conclusions."  § 300aa-13(b)(1).  The special master is then required to weigh the
evidence presented, including contemporaneous medical records and testimony.  *See
Burns ex rel. Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir.
1993).

## IV.    Discussion

If petitioner were able to establish the presence of an injury consistent with a
Table SIRVA, she would benefit from a causal presumption.  In that regard, the medical
records do suggest that K.T. likely did not have any preexisting shoulder dysfunction
prior to vaccination (Ex. 5, p. 82) and that he likely did suffer an immediate post-
injection onset of shoulder pain (*id.* at 56-59; Ex. 7, p. 8).  However, the records
document that K.T. was also suffering neurologic symptoms of numbness and loss of
sensation (Ex. 7, p. 8), which are incompatible with SIRVA as potential evidence of a
neuropathy.  42 C.F.R § 100.3(c)(10)(iv).  In fact, K.T.'s treating physician initially
suspected a nerve injury (Ex. 5, p. 56) whereas the SIRV QAI specify that "SIRVA is not
a neurological injury." 42 C.F.R § 100.3(c)(10).

Conversely, however, the medical records that have been filed to date are also insufficient to preponderantly demonstrate the presence of any vaccine-caused neurologic injury.  Absent the causal presumption provided to Table injuries, petitioner bears a burden of proof to demonstrate vaccine causation via medical records or medical opinion.  In that regard, K.T.'s treating physician only questioned (*i.e.,* noting "?") whether K.T. suffered a vaccine administration-related nerve injury. (Ex. 5, p. 56.) Moreover, the records for objective test results to confirm K.T.'s reported symptoms were not filed and none of the medical records that have been filed reflect a specific neurologic diagnosis by K.T.'s treating physicians.  Thus, K.T.'s medical records do not support petitioner's allegations of vaccine causation by a preponderance of the evidence and she did not otherwise file a medical opinion from an expert in support of her allegations.

Petitioner has been provided a full and fair opportunity to develop the record of this case.  However, the record that has been developed to date does not preponderantly support petitioner's claim.  Thus, dismissal on the existing record is appropriate pursuant to Vaccine Rule 8(d).  Additionally, despite multiple orders allowing her time to file outstanding medical records, petitioner has not taken any steps to substantively prosecute this case since the time her prior counsel departed the case. Moreover, she has missed multiple deadlines and has failed to engage in even basic communication with the court despite repeated warnings.  Accordingly, petitioner's conduct constitutes a failure to prosecute pursuant to Vaccine Rule 21(c) that forms a separate basis for dismissal.

## V.    Conclusion

Both petitioner and K.T. have my sympathy for what they have endured. However, the record of this case is insufficient for any finding of entitlement to compensation and the case cannot be allowed to remain pending indefinitely. Accordingly, for the reasons discussed above, this case is now **DISMISSED**.  The clerk of the court is directed to enter judgment in accordance with this decision.[5]

**IT IS SO ORDERED.**

**s/Daniel T. Horner**
Daniel T. Horner
Special Master

---

[5] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by each party, either separately or jointly, filing a notice renouncing the right to seek review.